UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEW LIFECARE HOSPITALS OF
NORTH CAROLINA LLC, *et al.*,

        Plaintiffs,

        v.

ALEX M. AZAR, II, *Secretary of the U.S. Department of Health and Human Services, in his official capacity,*

        Defendant.

Case No. 1:17-cv-00237 (TNM)

**MEMORANDUM OPINION**

Four long-term care hospitals ("the Providers") seek judicial review of the Secretary of Health and Human Services' denial of their claims for reimbursement of deductible and coinsurance payments that Medicare beneficiaries did not pay.[1] The Centers for Medicare and Medicaid Services ("CMS"), which administer the Medicare program on behalf of the Secretary, denied their reimbursement claims because the Providers did not comply with CMS's so-called "must-bill" policy. The Providers admit as much, but they insist that CMS's application of that policy was unlawful.

Both the Providers and the Secretary now move for summary judgment. Given the deferential standard of review and the limited record before it, the Court will grant summary judgment to the Secretary.

---

[1]     Alex M. Azar, II, the Secretary for the U.S. Department of Health and Human Services, is automatically substituted for former Acting Secretary Norris Cochran under Fed. R. Civ. P. 25(d).

# I. BACKGROUND

## A. Legal Background

### 1. The Medicare Program

The Medicare program "is a federally funded medical insurance program for the elderly and disabled." *Fischer v. United States*, 529 U.S. 667, 671 (2000). CMS administers the Medicare program on behalf of the Secretary, *see Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006), "through contracts with [M]edicare administrative contractors," 42 U.S.C. §§ 1395h(a), 1395u(a). A provider must submit cost reports annually to a contractor who, in turn, determines the payment to be made to that provider. *See* 42 C.F.R. §§ 413.20, 413.24(f). A contractor then issues a Notice of Program Reimbursement that specifies the allowable Medicare payment. *Id.* § 405.1803.

If a provider is "dissatisfied with a final determination" of the contractor, it may appeal that determination to the Provider Reimbursement Review Board ("the Board"). 42 U.S.C. § 1395oo(a). The Board's decision is final unless the Secretary "reverses, affirms, or modifies the Board's decision." *Id.* § 1395oo(f). The Secretary has delegated his authority to review the Board's decisions to the CMS Administrator. *See* 42 C.F.R. § 405.1875(a)(1). If a provider is dissatisfied with the Board's decision or the Secretary's decision, it may seek judicial review of that decision by filing a civil action in federal court. 42 U.S.C § 1395oo(f)(1); 42 C.F.R. § 405.1877(b).

### 2. The Medicaid Program

"The Medicaid program is a cooperative federal-state program to provide medical care for eligible low-income individuals . . . jointly funded by federal and state governments." *Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079, 1081 (D.C. Cir. 2015). For a state to qualify

for federal funding, the Secretary must approve the state's Medicaid plan, which sets out, among other things, covered medical services. 42 U.S.C. §§ 1396a, 1396b.

Some patients, so-called "dual eligibles," are eligible for both Medicare and Medicaid. *See Grossmont Hosp. Corp.*, 797 F.3d at 1081. In many cases, these patients cannot afford to pay their Medicare deductibles and coinsurance costs. States must use their Medicaid dollars to pay Medicare cost-sharing obligations for dual eligible patients. *See* 42 U.S.C. § 1396a(a)(10)(E)(i).

### 3. "Bad Debts"

If Medicare patients fail to pay the deductible and coinsurance payments that they owe to providers, the providers may seek reimbursement from CMS for these amounts—called "bad debts." *See* 42 C.F.R. § 413.89(e). Medicare "reimburses the health care provider for this 'bad debt'" to prevent cross-subsidization, *i.e.*, "a cost shift from the Medicare recipient to individuals not covered by Medicare." *Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 786 (9th Cir. 2003).

To obtain reimbursement for bad debt, providers must establish that these criteria are satisfied:

> (1) The debt must be related to covered services and derived from deductible and coinsurance amounts.
> (2) The provider must be able to establish that reasonable collection efforts were made.
> (3) The debt was actually uncollectible when claimed as worthless.
> (4) Sound business judgment established that there was no likelihood of recovery at any time in the future.

42 C.F.R. § 413.89(e). Chapter 3 of CMS's Provider Reimbursement Manual ("the Manual") provides more instruction about bad debt reimbursement. *See generally* The Provider Reimbursement Manual—Part 1, https://www.cms.gov/Regulations-and-

3

Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021929.html. First, Section 310 of the Manual requires that "a provider's effort to collect Medicare deductible and coinsurance amounts must be similar to the effort the provider puts forth to collect comparable amounts from non-Medicare patients." Manual § 310. Section 312, however—which addresses bad debts associated with "indigent or medically indigent" patients—provides that "[o]nce indigence is determined and the provider concludes that there ha[s] been no improvement in the beneficiary's financial condition, the debt may be deemed uncollectible without applying the § 310 procedures." *Id.* § 312.

Section 322 of the Manual provides specific instruction on bad debts associated with dual eligible patients. *Id.* § 322. It provides that

> Where the State is obligated either by statute or under the terms of its [Medicaid] plan to pay all, or any part, of the Medicare deductible or coinsurance amounts, those amounts are not allowable as bad debts under Medicare. Any portion of such deductible or coinsurance amounts that the State is not obligated to pay can be included as a bad debt under Medicare, provided that the requirements of § 312 or, if applicable, § 310 are met.

*Id.* Additionally, Section 322 addresses situations in which "the State has an obligation to pay, but either does not pay anything or pays only part of the deductible or coinsurance because of a State payment 'ceiling.'" *Id.* In those situations, Section 322 instructs that, "any portion of the deductible or coinsurance that the State does not pay that remains unpaid by the patient, can be included as a bad debt under Medicare, provided that the requirements of § 312 are met." *Id.*

### 4. The "Bad Debt Moratorium"

In 1987, Congress enacted legislation to "freeze" the Secretary's Medicare bad debt reimbursement policies. *Hennepin Cnty. Med. Ctr. v. Shalala*, 81 F.3d 743, 747, 751 (8th Cir. 1996); *Foothill Hosp. v. Leavitt*, 558 F. Supp. 2d 1, 3–5 (D.D.C. 2008). This legislation, called the "Bad Debt Moratorium," provides that "the Secretary of Health and Human Services shall

4

not make any change in the policy in effect on August 1, 1987, with respect to payment . . . for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] (including criteria for what constitutes a reasonable collection effort, including criteria for indigency determination procedures, for record keeping, and for determining whether to refer a claim to an external collection agency)." *See* Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Pub. L. No. 100–203, tit. IV, § 4008(c), 101 Stat. 1330–55, *as amended by* Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, tit. VIII, § 8402, 102 Stat. 3342, 3798, *reprinted as amended at* 42 U.S.C. § 1395f note (2012).

**B. Factual Background**

At issue here is CMS's "must-bill" policy. Under the "must-bill" policy, providers must both (1) bill their state Medicaid programs; and (2) receive a Remittance Advice ("RA"), a specific document from the state Medicaid programs asserting that the states are not liable for any portion of the bad debts. A.R. 15. The Providers are long-term care hospitals, or "LTCHs." For the fiscal years at issue, the Providers were not enrolled in Medicaid. *See* A.R. 16. According to the Providers, before April 2008, CMS contractors—who review the Providers' annual claims for reimbursement—treated proof of a beneficiary's indigence, for example, his dual eligible status, as a sufficient basis for bad debt reimbursement. Pls.' Mot. for Summ. J. ("Pls.' Br.") at 11, ECF No. 12.[2] In other words, the Providers claim that, in the past, if the CMS contractors knew that a beneficiary was a dual eligible, they treated the debt associated with him as reimbursable bad debt and did not require the providers to comply with the must-bill policy. *Id.*

---

[2]   All page citations are to the page numbers generated by the Court's CM/ECF system.

But not anymore. In April 2008, contractors issued Notices of Program Reimbursement denying about three million dollars' worth of reimbursement claims because the Providers had not complied with the CMS's must-bill policy. A.R. 409–13; 919. They had not billed their state Medicaid programs or received RAs. *Id.* In this lawsuit, the Providers object to this alleged abrupt change.

The Providers appealed the contractors' determinations to the Board, which held a hearing on their claims. *See* A.R. 51. In its decision, the Board split the Providers into two groups. *See* A.R. 51–62. First, the Board found that the Louisiana and Texas Providers could have enrolled in their state Medicaid programs but "made a business decision *not* to participate." A.R. 59–60 (emphasis in original). The Board thus upheld the CMS contractors' determinations for those Providers. A.R. 60. But, according to the Board, the North Carolina and Pennsylvania Providers were differently situated. *See* A.R. 60. The Board found that neither state Medicaid program allowed them to enroll for the fiscal years at issue. A.R. 60. So the Board reversed the CMS contractors' decisions as to these Providers and ordered the contractors to consider documentation that did not include a State-issued RA in determining the amount of reimbursable bad debt. A.R. 61. That was not the end of the matter though.

Next, the Administrator took up review of the Board's decision. A.R. at 2. He affirmed the Board's decision as to the Louisiana and Texas Providers but reversed it as to those in North Carolina and Pennsylvania. A.R. 2–22. In short, he concluded that CMS's must-bill policy applies to all the Providers. A.R. 2–22. He opined that "[w]here States are made aware of their duty and still refuse to enroll Providers for the purpose of billing and receiving remittance advices, or otherwise refuse to process nonenrolled providers' claims, then the appropriate course would be for the Providers to take legal action with their states." A.R. 18. According to

the Administrator, "[t]he Providers' assertions, that in some States the cost sharing liability would be zero, fails to recognize that States are in the best situation to make that determination." A.R. 21. So the reimbursement claims for three million dollars were ultimately denied.

The Providers then sued here. *See* Compl., ECF No. 1. Both parties have now cross-moved for summary judgment. *See* Pls.' Br.; Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 36.

## II. LEGAL STANDARDS

Summary judgment is usually only appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56. But when a court is reviewing an administrative agency's decision, the standard set out in Federal Civil Procedure Rule 56 does not apply. *See Richards v. I.N.S.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977). Instead, as both parties acknowledge, courts review an agency's decision under the Administrative Procedure Act. *See Ramaprakash v. Fed. Aviation Admin.*, 346 F.3d 1121, 1124 (D.C. Cir. 2003).

A court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary and capricious standard is deferential; it requires that agency action simply be reasonable and reasonably explained." *Comtys. for a Better Env't v. E.P.A.*, 748 F.3d 333, 335 (D.C. Cir. 2014) (cleaned up). And the agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

# III. ANALYSIS

The Providers do not object to the general must-bill policy per se. Rather, they claim that—until April 2008—CMS did not impose the must-bill policy on them.[3] Pls.' Br. at 12. This reversal, they contend, is unlawful. *Id.*

The Providers claim that the Administrator's decision (1) violates Medicare's prohibition against cost-shifting; (2) is inconsistent with the voluntary nature of Medicaid participation; (3) violates the Bad Debt Moratorium; (4) is arbitrary and capricious; and (5) is otherwise unlawful as applied to providers that do not participate in Medicaid. *See* Pls.' Br. at 6.

**A. The Administrator's Decision Did Not Violate Medicare's Prohibition Against Cost-Shifting.**

The Providers argue that the Administrator's refusal to reimburse them for their bad debts violates the statutory prohibition on cost-shifting because now the Providers must shift costs associated with Medicare beneficiaries to non-Medicare beneficiaries. *See* 42 U.S.C. § 1395x(v)(1)(A)(i) (explaining that the Secretary must "take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered . . . .").

But if the Providers' view were correct, the Administrator could not deny any bad debt reimbursement claims—no matter how frivolous. That is not the law. There is always a chance

---

[3] Although the parties refer to this policy as simply the "must-bill policy," there are two separate components: the requirement to bill the state Medicaid program and the requirement to secure the Remittance Advice from the state Medicaid program. *See Select Specialty Hosp.-Denver, Inc. v. Azar*, 391 F. Supp. 3d 53, 58 (D.D.C. 2019).

8

that providers might shift costs to non-Medicare patients in some way. *See Detroit Receiving Hosp. v. Shalala,* 194 F.3d 1312 (6th Cir. 1999). The cost-shifting provisions must be read together with the provision authorizing the Secretary to refuse to reimburse costs when the provider has failed to "furnish such information as the Secretary may request in order to determine the amounts due such provider." 42 U.S.C. § 1395g(a). The Administrator has the authority to enforce the statute's reasonable collection efforts requirements. So the Court rejects the Providers' cost-shifting argument.

**B. The Administrator's Decision Does Not Unlawfully Require the Providers to Participate in Medicaid.**

Next, the Providers argue that the Administrator's decision is unlawful because it requires the Providers to participate in Medicaid. Pls.' Br. at 29. And "participation in the Medicaid program is entirely optional." *Harris v. McRae*, 448 U.S. 297, 301 (1980).

The Providers claim that "[t]he effect of the Administrator's decision is to make Medicaid participation mandatory for all providers who intend to claim Medicare reimbursement for bad debts." Pls.' Br. at 29. This argument fails for at least two reasons.

First, the Providers offer no authority—legal or otherwise—for their predictive claim. According to the Administrator, state Medicaid programs must allow providers to enroll for the limited purpose of obtaining RAs. *See* A.R. 1098–1101.[4] Second, even though participation in Medicaid is optional, that says little about CMS's power to assess "reasonable collections efforts." Recall that the Secretary has the authority to refuse to reimburse costs if the provider has failed to "furnish such information as the Secretary may request in order to determine the

---

[4] In their reply brief, the Providers insist that this instruction came too late: in 2013. *See* Pls.' Reply at 36, ECF No. 39. But as the Court will discuss below, the Providers have not successfully shown that there was a change in policy.

9

amounts due such provider." 42 U.S.C. § 1395g(a). *Cf. Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrecoverable Tr. Dated June 27, 2002*, 410 F.3d 304, 313 (6th Cir. 2005) ("A state is not required to participate in the [Medicaid] program, but once it chooses to do so, the state's plan must comply with federal statutory and regulatory standards."). So the Court rejects the Providers' argument that the Administrator's decision unlawfully requires them to participate in Medicaid.

**C. The Providers Waived Their Argument That CMS Violated the Bad Debt Moratorium.**

The Providers argue that CMS's application of the must-bill policy is unlawful because it violates the Bad Debt Moratorium. Pls.' Br. at 29. CMS, in response, insists that its application of the must-bill policy to *all* providers is longstanding and predates the Bad Debt Moratorium in 1987. Def.'s Br. at 23. This might have been a potent argument, but the Providers waived it by failing to raise it to the Administrator. *See generally* A.R. 37–45 (Providers' Comments to the CMS Administrator).

In *Grossmont Hospital*, the D.C. Circuit held that a plaintiff "failed to preserve its challenge that the mandatory state determination policy violates the bad debt moratorium" by "failing to raise it in the administrative proceedings below." 797 F.3d at 1083–84. So too here.

"It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review." *Nuclear Energy Inst. v. E.P.A.*, 373 F.3d 1251, 1297 (D.C. Cir. 2004). In the context of administrative law, the waiver rule "provides this Court with a record to evaluate complex regulatory issues." *ExxonMobil Oil Corp. v. F.E.R.C.*, 487 F.3d 945, 962 (D.C. Cir. 2007). "Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not

resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996).

The Providers' mistake is fatal to its argument. Because the Providers did not raise their Bad Debt Moratorium argument to the Administrator, he made no factual finding on whether the CMS applied its must-bill policy in this way before 1987. *See generally* A.R. 1–22 (CMS Administrator's Decision). The Court cannot determine whether the Administrator's factual finding is supported by substantial evidence because there is no factual finding.

True, the Providers did argue to the *Board* that "[t]he recent change in CMS policy requiring these non-Medicaid-participating Providers to bill state Medicaid programs . . . violates the bad debt moratorium." A.R. 114. And the Board found that "pre-1987 bad debt policy in the [Manual] clearly established that providers have an obligation to bill 'the responsible party.'" A.R. 57. But briefing it to the Board was not enough. The Board's opinion was not CMS's final word once the Administrator decided to review the case. *See* 42 U.S.C. 1395oo(f) ("A decision of the Board shall be final *unless* the Secretary . . . reverses, affirms, or modifies the Board's decision.") (emphasis added); *cf. Howard Young Med. Ctr. Inc. v. Shalala*, 207 F.3d 437, 443 (7th Cir. 2000) (declining to bind the Secretary to a factual stipulation from the Board hearing, acknowledging that the Secretary was not a party to the Board proceeding). Because the Providers failed to preserve the issue in front of the Administrator, there is nothing on this point for the Court to review.

By contrast, consider *Mercy General Hospital v. Azar*, 344 F. Supp. 3d 321, 335 (D.D.C. 2018). There, the CMS Administrator had concluded that the must-bill policy did not violate the Bad Debt Moratorium based on his finding that the "policy [had] been in effect since before August 1, 1987, as is evidenced in numerous Administrator and Board decisions, . . . the

11

longstanding PRM sections 310 and 312 and 322, . . . [and] the longstanding regulations and statute." *Mercy General Hosp.*, 344 F. Supp. 3d at 335. So the *Mercy General Hospital* court then reviewed the same evidence presented to the Administrator. *See id.* at 335–53. For instance, it reviewed Board decisions from before the Bad Debt Moratorium, Administrator decisions from after the Bad Debt Moratorium, and statements by CMS officials. *Id.* It used that evidence to evaluate whether the Administrator's factual finding was supported by substantial evidence. *Id.*

But here, the Court simply does not have a comparable factual record. The *Mercy General Hospital* court was equipped to decide whether the must-bill policy violated the Bad Debt Moratorium: it had both the Administrator's factual finding and a developed evidentiary record. But no such findings or record are before this Court. For that, the Providers have themselves to blame.

For these reasons, the Court finds that the Providers did not preserve their Bad Debt Moratorium argument.[5]

---

5   To be sure, the Providers likely would have had a non-frivolous argument. While courts have generally enforced the so-called must-bill policy, "[i]t is not clear that the consistently enforced version of the 'must-bill policy' includes *both* the Billing Requirement and the RA Requirement." *Maine Med. Ctr. v. Burwell*, 775 F.3d 470, 473 n.6 (1st Cir. 2015).
  In fact, another judge in this District recently concluded that the Administrator's finding that "remittance advice requirement existed prior to the Moratorium [was] not supported by substantial evidence." *Mercy Gen. Hosp.*, 344 F. Supp. 3d at 351. *See also Select Specialty Hosp.-Denver, Inc.*, 391 F. Supp. 3d at 55 (concluding that before 2007, CMS had reimbursed long-term care hospitals for their dual eligible patients' bad debt "without requiring [them] to bill state Medicaid programs for a formal determination of how much of that bad debt would be covered by state Medicaid programs"); *Dist. Hosp. Partners, L.P. v. Sebelius*, 932 F. Supp. 2d 194, 206 (D.D.C. 2013) (concluding that the challenged policy violated the Moratorium in part because "the Secretary ha[d] pointed to no persuasive evidence that supports her contention, much less pre-1987 evidence"); *Foothill Hosp.*, 558 F. Supp. 2d at 10 (concluding that the challenged policy "did not exist prior to the effective date of the Moratorium"). But the Court is bound by the limited record before it. *See CTS Corp.*, 759 F.3d at 64 (D.C. Cir. 2014).

12

**D. The Providers Did Not Prove that CMS Changed How It Applied Its Must-Bill Policy.**

So the Court reaches the heart of this dispute: the Providers insist that before 2008, the contractors reimbursed them for dual eligible bad debts without requiring the Providers to submit RAs from the state Medicaid programs. *See* Pls.' Br. at 11. Then, according to the Providers, the contractors abruptly began denying the bad debts by applying the must-bill policy, retroactively and without formal notice. *See id.* But the Providers have not proven that the contractors, in the past, *did* reimburse them for bad debts without requiring RAs. In short, the Providers have not shown a change, abrupt or otherwise.

During the Board hearing, John Michael Cronin, the Providers' Vice President for Reimbursement, testified. *See* A.R. 343. He claimed that the contractors used to reimburse claims for dual eligible beneficiaries' bad debts without RAs. *Id.* at 343, 345. He also testified that before 2008, the Providers "never received anything in writing" that the must-bill policy would be applied to them. *Id.* at 347–48.

The Providers, however, point to no other evidence in the record to substantiate Mr. Cronin's assertions. True, the record confirms that the Providers submitted claims for reimbursement without RAs before April 2008. *See* A.R. 934. But the Providers have not identified evidence that contractors ever accepted such claims. They insist that CMS possesses their "prior cost reports and cost report data." Pls.' Reply at 27, ECF No. 39. Presumably, the Providers have this documentation, too. But they are not in the record before the Court.

In any event, the Providers are in the—however difficult—procedural posture where they must show that the Administrator's decision was arbitrary and capricious. And because they

have not established that CMS previously reimbursed them for bad debts without requiring RAs, the bulk of their arguments failed.

The Administrator's decision is entitled to a "presumption of regularity," and although "inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). In cases involving APA claims, such as this one, "the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).

In *Select Specialty Hospital-Denver, Inc. v. Azar*, by contrast, the plaintiffs established that CMS had changed how it applied its must-bill policy. 391 F. Supp. 3d 53, 61–63 (D.D.C. 2019). There, the plaintiffs also claimed that CMS abruptly began denying their reimbursement claims for dual-eligible patients' bad debts unless they had complied with CMS's must-bill policy. *Id.* at 55. But there they presented evidence of this abrupt change. *See id.* at 61–63. For instance, they offered a pre-2007 Adjustment Report that showed that no deductions were made for failure to comply with the must-bill policy. *See id.* at 61. They also presented "contemporaneous correspondence," such as emails *from* the CMS contractors *to* plaintiffs, confirming that CMS's application of the must-bill policy was a change in policy. *Id.* at 62. But the Providers here have failed to develop a similar record. They do not point to pre-2008 Adjustment Reports and they do not proffer emails or letters from CMS or its contractors confirming that there was a change in policy around this time.

The Court's role is limited and confined by the record in front of it. *See CTS Corp. v. E.P.A.*, 759 F.3d 52, 64 (D.C. Cir. 2014) ("It is black-letter administrative law that in an Administrative Procedure Act case, a reviewing court should have before it neither more nor less

information than did the agency when it made its decision." (cleaned up)). And the Providers have the burden of proving that the Administrator's decision was unlawful. *See id.* at 59.

Because the Providers have not proven that CMS changed how it applied the must-bill policy, many of the Providers' claims fail. The Court must reject the Providers' arguments that CMS's decision was arbitrary and capricious because it (1) constituted "an unexplained departure" from its prior practice, as there was no proven departure; (2) ignored the Providers' legitimate reliance on CMS's longstanding practice, as there was no proven new practice; and (3) was a "retroactive application" of a new policy without notice, as there was no proven new policy.

The Court also must reject the Providers' argument that the Administrator's decision is not supported by substantial evidence. Pls.' Br. at 53. According to the Providers, the contractors told them that CMS abruptly required them to "follow the must-bill policy on these particular Providers" and apply the must-bill policy to all providers. *Id.* at 54. And the Providers complain that there is no evidence in the record showing that CMS ever ordered the contractors to start applying the must-bill policy to them. *Id.* They point out that "[t]here is nothing in writing to confirm this change in interpretation by the CMS central office, and the [contractors] have not provided any evidence as support." *Id.* But, again, the Providers have not shown that there was a change. If there there was no change, it follows that there would be no evidence in the record of CMS suddenly ordering the contractors to apply the must-bill policy. So because the Providers have not shown a change in how CMS applies its must-bill policy, this claim also fails.

### E. The Providers Have Not Shown that the Administrator's Decision was Otherwise Arbitrary and Capricious or an Abuse of Discretion.

The Providers also argue that the Administrator's decision was arbitrary and capricious because they had no way to comply with the must-bill policy. Pls.' Br. at 31. They claim that North Carolina and Pennsylvania had Medicaid regulations and policies that prevented them from obtaining RAs because they were non-Medicaid participating providers. *Id.*

In his decision, the Administrator explained that "States must be able to process dual eligible beneficiary claims to determine the State's cost sharing liability." A.R. 18. And if a state does not process a dual-eligible claim, "a Provider's remedy must be sought within the State." A.R. 18. In short, if a state refuses to issue RAs, for whatever reason, the Providers must seek relief against that state.

On this record, it is far from clear that the Providers could not have billed North Carolina and Pennsylvania to acquire RAs—even if they could not enroll in those states' Medicaid program.[6] To prove that they could not have complied with the must-bill policy in these states, the Providers cite only testimony of their own employee and their own prepared statements. *See* Pls.' Br. at 29–30. Indeed, the Providers admit that they "were able to get the North Carolina and Pennsylvania Medicaid programs to eventually allow them to bill Medicare cost-sharing claims, after the cost reporting periods at issue." *See* Pls.' Reply at 24 (citing A.R. at 354–55). While this fact alone does not prove that they could have complied, it undermines their arguments to the contrary.

---

[6] The Providers do not dispute that they could have enrolled in the state Medicaid programs in Louisiana and Texas. *See generally* Pls.' Br. and Pls.' Reply.

In any event, a court must uphold an agency's decision if the agency shows that it has "examin[ed] the relevant data and articulat[ed] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). That is what happened here. CMS does not have to change how it enforces its bad debt policy based on whether states comply with federal regulations. And the Providers do not argue otherwise. While navigating both the federal and state bureaucracies involved is no doubt frustrating, given the deferential standard of review here, the Court cannot find that CMS failed to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (cleaned up).[7]

The Providers also argue that the Court should reverse the Administrator's decision because it is inconsistent with its treatment of other providers in similar situations. Pls.' Br. at 44. As both parties acknowledge, community mental health centers ("CMHCs") in California and institutes for mental diseases ("IMDs") may claim dual eligible bad debt without billing the state. *See* Pls.' Reply at 32; Def.'s Reply at 11, ECF No. 41. CMS insists that these are not exceptions to its must-bill policy but rather these two types of providers are "recognized by statute as exempt from the policy." Def.'s Br. at 29.

California does not license CMHCs, *see* Cal. Health & Safety Code § 1200 *et seq.*, so it is impossible for them to enroll in California's Medicaid program or have claims processed. And while IMDs provide services to patients between the ages of 22 and 64, the Medicaid statute and

---

[7] For the same reasons, the Court rejects the Providers' argument that "it was arbitrary and capricious for the agency to refuse to accept proof of indigence to support the claimed bad debts when [they] have no ability to force the states to process non-Medicaid-participating provider claims." Pls.' Br. at 42. The Providers have not shown that it was arbitrary and capricious for CMS to conclude that the Providers could acquire RAs during the relevant years.

regulations categorically precludes payment for services provided to these younger patients. *See* 42 U.S.C. § 1396d(a)(14); 42 C.F.R. §§ 435.1008(a)(2), 441.13(a)(2).

The party complaining of an inconsistency must "bring before the reviewing court sufficient particulars of how [it] was situated, how the allegedly favored party was situated, and how such similarities as may exist dictate similar treatment and how such dissimilarities as may exist are irrelevant or outweighed." *P.I.A. Mich. City, Inc. v. Thompson*, 292 F.3d 820, 826 (D.C. Cir. 2002). The Providers have not carried their burden here. In short, the Providers differ from CMHCs in California and IMDs. While California refuses to license CMHCs, a fact memorialized in a state statute, the Providers have not identified similar statutes in their own states. As to IMDs, while the Medicaid statute categorically precludes payment for younger patients, the Providers offer no comparable categorical provision in federal law.

Even if "[t]here is . . . nothing preventing the Secretary from applying the same type of exception or exemption to the [Providers]," Pls.' Reply at 32, it is hardly arbitrary and capricious for CMS to treat the Providers differently. With IMDs and California CMHCs, CMS is confident that the states have no obligation to pay the debt at issue, and there are good reasons for such a belief. In the context of the Providers, however, CMS is less confident, so it requires them to bill the state Medicaid programs. "The arbitrary and capricious standard . . . requires that agency action simply be reasonable and reasonably explained." *Comtys. for a Better Env't*, 748 F.3d at 335. CMS's decision not to exempt the Providers clears this low bar.

## IV. CONCLUSION

For these reasons, the Plaintiffs' Motion for Summary Judgent will be denied, and the Defendant's Motion for Summary Judgment will be granted. A separate order will issue. [8]

Dated: September 27, 2019                                TREVOR N. McFADDEN, U.S.D.J.

---

[8] The Secretary filed an opposed motion for leave to file a sur-reply about the Bad Debt Moratorium issue, *see* ECF No. 45, and then filed a sur-reply, *see* ECF No. 47. The Providers later moved to strike the Secretary's sur-reply, *see* ECF No. 48. Because the Court finds that the Providers did not preserve their Bad Debt Moratorium argument, the Court will deny both motions as moot.