**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NEW LIFECARE HOSPITALS OF NORTH CAROLINA LLC,** *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**ALEX M. AZAR, II**, *Secretary of the U.S. Department of Health and Human Services, in his official capacity,*<br><br>Defendant. | Case No. 1:17-cv-00237 (TNM) |

## <u>MEMORANDUM OPINION</u>

Four long-term care hospitals ("the Providers") sued the Secretary of Health and Human

Services alleging that portions of their Medicare reimbursements were improperly denied.  After

considering the parties' cross-motions for summary judgment, the Court granted judgment to the

Secretary.  *See New LifeCare Hosps. of N.C.  v. Azar* ("*New LifeCare I*"), 416 F. Supp. 3d 11

(D.D.C. 2019).[1]  Among other findings, the Court held that the Providers had waived one of their

arguments when they raised it at an intermediate administrative review, but then failed to re-raise

it with the Administrator of the Centers for Medicare and Medicaid Services ("CMS") upon her

review.  *See id.* at 19–20.  Now the Providers move for reconsideration under Federal Rules of

Civil Procedure 59(e) and 60(b).  They urge the Court to reverse course because of "clear error"

in the Court's opinion "and to prevent manifest injustice."  Pls.' Mot. Recons. ("Pls.' Mot.") at 2,

ECF No. 52.  The Court will deny the motion.

---

[1]  Alex M. Azar, II, the Secretary for the U.S. Department of Health and Human Services, was automatically substituted for former Acting Secretary Norris Cochran under Fed. R. Civ. P. 25(d).

## I.

In *New LifeCare I*, the Court surveyed the background of the Providers' claims, so a detailed review is unnecessary here.  *See* 416 F. Supp. 3d at 14–17.  The sole issue on reconsideration is the Providers' argument about the so-called Bad Debt Moratorium.  At summary judgment, the Providers argued that CMS's decision not to reimburse their "bad debts" violated the congressionally enacted moratorium providing that "'the Secretary of Health and Human Services shall not make any change in the policy in effect on August 1, 1987, with respect to payment . . . for reasonable costs relating to unrecovered costs associated with unpaid deductible and coinsurance amounts incurred under [the Medicare program] . . . .'"  *See New LifeCare I*, 416 F. Supp. 3d at 17 (quoting Omnibus Budget Reconciliation Act of 1987 ("OBRA"), Pub. L. No. 100–203, tit. IV, § 4008(c), 101 Stat. 1330–55, *as amended by* Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100–647, tit. VIII, § 8402, 102 Stat. 3342, 3798, *reprinted as amended at* 42 U.S.C. § 1395f note (2012)).

The Providers had raised the Bad Debt Moratorium as one of several arguments before the Provider Reimbursement Review Board ("PRRB" or "Board").  A.R. 57.  There, the Providers argued that the Bad Debt Moratorium imposed two limits on CMS:  "First, CMS cannot change its bad debt policy from the policy that was in effect on August 1, 1987.  Second, CMS cannot require a provider to change the bad debt procedures that provider had in place on August 1, 1987."  A.R. 113.  "Despite the prohibitions imposed by the moratorium," the Providers argued that "CMS . . . communicated to the Providers . . . beginning in April 2008 an abrupt change . . . whereby the policy would now apply to non-Medicaid-participating providers."  A.R. 149.  That, the Providers said, was "contrary to pre-moratorium CMS policy."  A.R. 114 (cleaned up).  *See also* A.R. 657–58, 673–74 (similar arguments in Providers' Final

Position Paper to Board).  The Providers had other arguments before the Board, too.  These included:  (1) That it was impossible for the Providers to comply with the must-bill policy; (2) The Secretary's application of the must-bill policy was arbitrary and capricious for various reasons; (3) The must-bill policy effectively forced Providers to enroll in Medicaid in every state; and (4) The must-bill policy imposed illegal cost-shifting on the Providers.  *See* A.R. 65–168.

The Board ended up ruling for some Providers but against others, splitting them into two groups based on the governing state regulations where they operate.  A.R. 51–62; *see New LifeCare I*, 416 F. Supp. 3d at 17.  And while the Board discussed the Providers' Bad Debt Moratorium argument at length, *see* A.R. 54–59, it still ruled against the hospitals that "could have enrolled in their state Medicaid programs but 'made a business decision not to participate.'" *New LifeCare I*, 416 F. Supp. 3d at 17 (quoting A.R. 59–60).

But that was not the end of the matter.  Two weeks after the Board issued its mixed decision, the Administrator notified the parties that she had decided to review it, and she invited comments from the parties.  A.R. 2, 47; *see* 42 U.S.C. § 1395oo(f); 42 C.F.R. § 405.1875(c)(4) (parties "may tender written submissions" if the Administrator accepts review).  The Providers capitalized on this opportunity in a seven-page, single-spaced letter.  A.R. 37–45.

This detailed submission, however, never mentioned their Bad Debt Moratorium argument.  Instead, the Providers focused on the central issue in the Board's decision—the unresolved question "of whether the CMS must-bill policy applies to dual-eligible bad debts of providers that *did not participate in Medicaid*."  A.R. 40 (emphasis in original).  The Providers strenuously argued "this *core* issue that non-Medicaid-participating providers are in a Catch-22."  A.R. 40 (emphasis added).  And the Providers urged the Administrator to affirm the Board's

decision "for Providers in states where the Medicaid program would not enroll" Providers, and "reverse the portion of the PRRB Decision that affirmed the Medicare Contractors' dual eligible bad debt adjustments for the remaining Providers[.]"  A.R. 38.

Ultimately, the Administrator was unconvinced, and she reversed even the partial win the Providers achieved below.  Not surprisingly given the Providers' arguments before her, the Administrator's decision did not address the Bad Debt Moratorium issue.  *See generally* A.R. 2–22 (CMS Administrator's Decision).  Yet when the Providers sued here over the Administrator's denial decision, they resurrected their Bad Debt Moratorium argument.  *See New LifeCare I*, 416 F. Supp. 3d at 19–20.  Reviewing this record, the Court held in *New LifeCare I* that the Providers might have had a "potent argument" that CMS violated the Moratorium, but that they "waived it by failing to raise it to the Administrator."  *Id*. at 19.

Now the Providers argue that reconsideration is required "to prevent manifest injustice." Pls.' Mot. at 2.  More, they suggest the Court's waiver holding was "clear error."  *Id.*  The Secretary opposes reconsideration and argues the Court "was entirely correct in concluding that Plaintiffs waived the argument . . . by not raising it before the Administrator."  Defs.' Opp'n at 5. The Providers have replied, *see* Pls.' Reply, ECF No. 54, the Court heard the parties' oral arguments, and the issue is now ripe for decision.

## II.

"Although the court has considerable discretion in ruling on a Rule 59(e) motion, the reconsideration or amendment of a judgment is nonetheless an extraordinary measure."  *Leidos v. Hellenic Republic*, 881 F.3d 213, 217 (D.C. Cir. 2018).  Reconsideration is only appropriate because of "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice."  *Firestone v. Firestone*, 76 F.3d 1205,

1208 (D.C. Cir. 1996) (citation omitted).  "Rule 59(e) permits a court to alter or amend a judgment, but it may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."  *Exxon Shipping v. Baker*, 554 U.S. 471, 486 n.5 (2008) (quotation omitted).

On a claim of clear error or manifest injustice, the question is whether the decision would "upset settled expectations—expectations on which a party may reasonably place reliance." *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007).  A "manifest injustice requires at least (1) a clear and certain prejudice to the moving party that (2) is fundamentally unfair in light of governing law.'"  *Leidos*, 881 F.3d at 217 (cleaned up).  The Court will also apply the same clear error standard for the Providers' Rule 60(b) claims.  *See Smalls v. United States*, 471 F.3d 186, 191 (D.C. Cir. 2006); *Owens v. Rep. of Sudan*, 864 F.3d 751, 818 (D.C. Cir. 2017).

The underlying summary judgment standard is a familiar one.  And it favors the Secretary.  The Court considers whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  "The arbitrary and capricious standard is deferential; it requires that agency action simply be reasonable and reasonably explained."  *Comtys. for a Better Env't v. E.P.A.*, 748 F.3d 333, 335 (D.C. Cir. 2014) (cleaned up).  So CMS must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (cleaned up).

### III.

The issue is whether the Providers waived arguments here that they failed to press *throughout* the agency review process.  The caselaw on issue exhaustion "emphasizes the need

for parties seeking judicial review of agency action to raise their issues before the agency during the administrative process in order to preserve those issues for judicial review." *Advocs. for Hwy. & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005) (citing *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952)).

## A.

The seminal case in this area is *Sims v. Apfel*, in which the Supreme Court considered issue exhaustion in a Social Security appeal. 530 U.S. 103 (2000).[2] *Sims* teaches that issue exhaustion may be required in a given administrative context for any of three reasons.

*First*, issue exhaustion at the administrative level may be required by statute. *Id.* at 107. Courts have found this requirement in statutes governing the National Labor Relations Board, the Federal Power Commission, and the Federal Communications Commission, among others. *See id.* at 107–108 (citing cases). But the Secretary points to no statutory requirement here.

*Second*, agency regulations also commonly require issue exhaustion. *Id.* at 108. Both before and after *Sims*, courts have often enforced exhaustion requirements in agency regulations. *Id.* So, for example, the D.C. Circuit has found issue exhaustion in regulations of the Federal Communications Commission, *see Environmentel, LLC v. F.C.C.*, 661 F.3d 80, 83–84 (D.C. Cir. 2011), and of the Nuclear Regulatory Commission, *see Vermont Dep't of Pub. Serv. v. United States*, 684 F.3d 149, 157 (D.C. Cir. 2012) ("We find the NRC regulations applicable here are materially indistinguishable from the FCC regulations in *Environmentel*."). The Fifth Circuit has even found issue exhaustion in the HHS Secretary's regulations, though in provisions unrelated

---

[2] As in *Sims*, this case implicates issue exhaustion but not exhaustion of administrative remedies. *See Sims*, 530 U.S. at 107. The Providers exhausted their remedies and are entitled by statute to challenge the agency's decision here. 42 U.S.C. § 1395oo(f).

to this case.  *See Palm Valley Health Care, Inc. v. Azar*, 947 F.3d 321, 327 (5th Cir. 2020) (citing 42 C.F.R. § 405.1112(b), (c)).  But the regulations here impose no such requirement.[3]

*Third*, even without a statutory or regulatory requirement, "courts require administrative issue exhaustion 'as a general rule'" when the administrative review process involves adversarial proceedings.  *Sims*, 530 U.S. at 109 (quoting *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 36–37 (1952)).  "The basis for a judicially imposed issue-exhaustion requirement is an analogy to the rule that appellate courts will not consider arguments not raised before trial courts."  *Sims*, 530 U.S. at 108–09.  So just as "litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence . . . it [is] equally desirable that parties should have an opportunity to offer evidence on the general issues involved in the less formal proceedings before administrative agencies entrusted with the responsibility of fact finding."  *Hormel v. Helvering*, 312 U.S. 552, 556 (1941).

And so, derived from litigation procedures, "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding."  *Sims*, 530 U.S. at 109.

---

[3]  For the first time at oral argument, agency counsel suggested that the regulations here compel issue exhaustion. Hr'g Tr. 26:1–8 (May 14, 2020).  According to the agency, the relevant section says that any "request for review (or a response to a request) must be submitted in writing, *identify the specific issues for which review is requested*, and explain why review is or is not appropriate[.]"  42 C.F.R. § 405.1875(c)(1)(iii) (emphasis added).  This may be true when a party seeks Administrator review.  But that regulation does not apply here.  Unlike the Department of Labor's regulations noted in *Sims*, 530 U.S. at 108, a request for Administrator review in this regulation is optional. *Compare* 20 C.F.R. § 802.211(a) (Department of Labor regulation stating that "the petitioner *shall* submit a petition for review to the Board which petition lists the specific issues to be considered on appeal" (emphasis added)) *with* 42 C.F.R. § 405.1875(c)(1) ("A party to a Board appeal or CMS *may* request Administrator review of a Board decision." (emphasis added)).  *See also Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 749 (6th Cir. 2019) ("the Supreme Court highlighted this specific regulation [20 C.F.R. § 802.211(a)] when noting that agencies may impose exhaustion mandates through their rulemaking." (citing *Sims*, 530 U.S. at 108)).  Indeed, under the Secretary's regulations at issue, when the Administrator takes up review on her own motion—as she did here—she notifies the parties that "the Board's decision is under review, and indicat[es] the specific issues that are being considered."  42 C.F.R. § 405.1875(c)(3)(i).  Here, the Administrator shared her intent to review the Board's entire decision.  A.R. 47.  Nor were the Providers required to seek Administrator review before filing this lawsuit.  *See* note 2, *supra*.

"Where the parties are expected to develop the issues in an adversarial administrative proceeding . . . the rationale for requiring issue exhaustion is at its greatest." *Id*. at 110.  But "[w]here, by contrast, an administrative proceeding is not adversarial, . . . the reasons for a court to require issue exhaustion are much weaker." *Id*.

Applying that rubric, a plurality of the Court reviewed a Social Security claimant's case for benefits and found that the Social Security Administration's "inquisitorial rather than adversarial" proceedings, *id*. at 111 (plurality opinion), gave "[p]erhaps the best example of an agency" not based "on the judicial model of decisionmaking," *id*. at 110 (citations omitted).[4] There, the claimant's case first went before an administrative law judge ("ALJ"), who denied her claim after a hearing.  *Id*.  Before she could seek judicial review, the Social Security regulations required the claimant to request another level of administrative review with the Social Security Appeals Council.  *Id*. at 105.  She did so, but the Council denied her request for review.  *Id*. at 105, 107.  Following that denial, she sued in federal court, where she raised two challenges to the ALJ's procedure that she had not raised in her request for the Council's review.  *Id*. at 105–106. The Fifth Circuit found that she had waived the arguments she failed to raise "in her request for review by the Appeals Council."  *Id*. at 106 (citing *Sims v. Apfel*, 200 F.3d 229 (5th Cir. 1998)). The Supreme Court reversed.

The four-justice plurality highlighted the Social Security Administration's "replacement of normal adversary procedure by . . . the investigatory model."  *Id*. at 110 (plurality opinion) (citations omitted)).  Finding "[t]he differences between courts and agencies are nowhere more

---

[4]  A majority in *Sims* agreed to the central holding that "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding."  *Sims*, 530 U.S. at 109.  A four-justice plurality then explained that holding for the claimant's Social Security appeal.  *Id*. at 110–12 (plurality opinion).  The four dissenting justices would have required issue exhaustion even there.  *Id*. at 119 (Breyer, J., dissenting).  Only Justice O'Connor would have imposed a more plaintiff-friendly standard.

pronounced than in Social Security proceedings," *id.*, the plurality concluded that the analogy to

judicial proceedings was too weak to support "a judicially created issue-exhaustion

requirement," *id.* at 112.

**B.**

Thus, the first question is whether the CMS appeals process evokes "the analogy to

normal adversarial litigation," or whether this "administrative proceeding is not adversarial,"

making the justification for a judicially imposed issue exhaustion rule "much weaker," *Sims*, 530

U.S. at 109–110.

Consider the inquisitorial Social Security process in *Sims*.  There, it was "the ALJ's duty

to investigate the facts and develop the arguments both for and against granting benefits," and

the Council conducted a "similarly broad" review.  *Id.* at 111 (plurality opinion (citations

omitted)).  More, the Social Security Commissioner had "no representative before the ALJ to

oppose the claim for benefits," and there was no sign that he opposed claimants before the

Appeals Council either.  *Id.*  And the Court found that "a large portion of Social Security

claimants either have no representation at all or are represented by non-attorneys[.]"  *Id.* at 112.

More still, solidifying the tone of review, the Social Security regulations noted its "informal,

nonadversary manner."  *Id.* at 111 (citation omitted).

Now contrast that with the CMS appeals process.  First, both sides had lawyers here.

Unlike the mostly unrepresented Social Security claimants, *see id.* at 112, the Providers are

sophisticated hospitals represented throughout their administrative appeals by a knowledgeable

and specialized attorney.  *See, e.g.*, A.R. 38 (Providers' counsel letterhead advertising "A health

law firm in the nation's capital").  At the PRRB and before the Administrator, the Providers

faced an adversarial process where the Contractors' attorneys opposed them in the role of a

"prosecution." *See, e.g.*, A.R. 2 (Administrator's decision noting Providers' and Contractors' submissions), 52 (noting Contractors' representation at PRRB hearing), 263–291 (Contractors' post-hearing brief). And at the PRRB, both the Providers and the Contractors presented documentary evidence, the Providers presented testimony tested through cross-examination, and the PRRB heard and ruled on legal objections just like a trial. A.R. 322–390 (PRRB transcript).

On similar facts, appellate courts have distinguished the Social Security procedures in *Sims* to impose an issue exhaustion requirement. In *Ballanger v. Johanns*, the Eighth Circuit held issue exhaustion applied to an adversarial Department of Agriculture process in which either party could "present oral and documentary evidence, oral testimony of witnesses, and arguments in support of the party's position; controvert evidence relied on by any other party; and question all witnesses." 495 F.3d 866, 870 (8th Cir. 2007). And in *Delta Foundation, Inc. v. United States*, the Fifth Circuit held that "unlike the [Social Security] proceedings in which the Appeals Council itself, and not the claimant, has the responsibility for identifying the claims and developing arguments, the parties appear [before the Health and Human Services Departmental Appeals Board] as adversaries, charged with presenting their arguments and supporting witnesses and effectively discrediting opposing parties through cross-examination." 303 F.3d 551, 561–62 (5th Cir. 2002). Indeed, the Eighth Circuit interprets *Sims* to suggest "that issue exhaustion is not, in general, disfavored, and courts should not be overly eager to characterize proceedings as non-adversarial." *Ballanger*, 495 F.3d at 870 (citing *Sims*, 530 U.S. at 109). Thus, the Court finds the CMS process at issue easily fits the adversarial proceedings model.

Indeed, the Providers concede that the PRRB process here is adversarial, arguing instead that the Administrator's "informal" review excuses the presumptive exhaustion requirement.

Hr'g Tr. 6:19–7:7 (May 14, 2020).  But the Providers' attacks on the "the analogy to normal adversarial litigation" is unpersuasive.  *See Sims*, 530 U.S. at 109.

For instance, the Providers argue that "the Court's decision [in *New LifeCare I*] overstated the significance of the comments a party *may* submit to the CMS Administrator during the course of the Administrator's review of a PRRB decision."  Pls.' Mot. at 4 (emphasis in original).  Besides arguing that the comments were optional, they also contrast these comments with the substantive briefs each party filed with the Board, noting the Administrator asked for submissions by fax and on a short timeline.  Pl.'s Mot. at 5; *see* A.R. 47 ("You have a right to submit comments within 15 days of your receipt of this letter. . . . If you do submit comments, we would appreciate if you would fax them to this office . . . to expedite review" (emphasis omitted)).

The Court is unconvinced by these distinctions.  Notably, the Administrator allows more time for submission than this Court's default rule for opposition briefs.  *Compare* 42 C.F.R. § 405.1875(c)(4)(i) (15 days) *with* LCvR 7(b) (14 days "or at such other time as the Court may direct").  And while the Providers suggest that comments "tend to be more informal" than briefs, Pl.'s Mot. at 5, the regulation requires that all submissions be "in writing [and] contain a certification that copies were served on all other parties, CMS, and any other affected nonparty," 42 C.F.R. § 405.1875(d).  The Providers were not constrained by a page limit or precluded from adopting their original briefs in full.  *See* 42 C.F.R. § 405.1875(c)(4)(ii).[5]  Recall that the

---

[5]  42 C.F.R. § 405.1875(c)(4)(ii) statesl:

Any submission must be limited to the issues accepted for Administrator review (as identified in the notice) and be confined to the record of Board proceedings (as described in § 405.1865 of this subpart). The submission may include –

(A) Argument and analysis supporting or taking exception to the Board's decision or other reviewable action;

(B) Supporting reasons, including legal citations and excerpts of record evidence, for any argument and analysis submitted under paragraph (c)(4)(ii)(A) of this section;

(C) Proposed findings of fact and conclusions of law;

Providers seized this opportunity, submitting a single-spaced, seven-page letter to the Administrator.  A.R. 37–45.  More, the parties were free to rebut each other's comments within the 15-day submission window.  42 C.F.R. § 405.1875(c)(4)(ii).  These all reinforce the adversarial nature of the administrative appeal process.  *See Sims*, 530 U.S. at 109.

During the motion hearing, the Providers also argued that the role of the CMS Office of the Attorney Advisor evidences an inquisitorial bent to the Administrator's review.  Hr'g Tr. 10:6–21 (May 14, 2020); *see* 42 C.F.R. § 405.1875(a) ("The Office of the Attorney Advisor must examine each Board decision . . . together with any review requests or any other submission made in accordance with the provisions of this section, in order to assist the Administrator's exercise of this discretionary review authority.").  Not so.  The Attorney Advisor acts more as a judge's law clerk than as the Commissioner in *Sims*. *Cf*. 530 U.S. at 111 (plurality opinion) ("The Commissioner's involvement in the Appeals Council's decision whether to grant review appears to be not as a litigant opposing the claimant, but rather just as an adviser to the Council regarding which cases are good candidates for the Council to review pursuant to its authority to review a case *sua sponte*." (citations omitted)).  Here, the Attorney Advisor's Office serves as a legal advisor to the Administrator, who has many tasks other than her quasi-judicial role.  *See* CMS Leadership, https://www.cms.gov/About-CMS/Leadership (Administrator "oversees a $1 trillion budget, representing 26% of the total federal budget, and administers health coverage programs for more than 130 million Americans").

Indeed, the Office of the Attorney Advisor not only reviews cases for sua sponte review, but also receives *all* party submissions from opposing, adversarial parties.  *See* 42 C.F.R. §

---

(D) Rebuttal to any written submission filed previously with the Administrator in accordance with paragraph (c)(4) of this section; or

(E) A request, with supporting reasons, that the decision or other reviewable action be remanded to the Board.

405.1875(a) ("All requests for Administrator review and any other submissions to the Administrator under paragraph (c) of this section must be sent to the Office of the Attorney Advisor."); *id.* § 405.1875(c)(1)(ii) (Office of Attorney Advisor must receive any party's request for review within 15 days of the PRRB decision); *id.* § 405.1875(c)(4)(i) (same for party submissions to Administrator).  The fact that the Administrator—who is not a lawyer—employs a legal staff to assist in her review of these adversarial filings is hardly surprising.  In the end, the Administrator, with the advice of her legal staff, reviews an admittedly adversarial proceeding below with the benefit of legal arguments made by lawyers representing the opposing sides. Nothing about this transforms an otherwise adversarial process into something else.

Nor are the Providers persuasive in downplaying the significance of the submissions they filed with the Administrator.  To be sure, the Providers are correct "that parties are 'not even required to make written submissions' to the Administrator."  Pl.'s Mot. at 4 (quoting *Loma Linda Univ. Kidney Ctr. v. Sebelius*, Case No. 06-1926 (TFH/DAR), 2011 WL 13063635, at *8 (D.D.C. Jan. 28, 2011)).  "If the Administrator accepts review of the Board's decision or other reviewable action, a party, CMS, or another affected nonparty . . . *may* tender written submissions regarding the review."  42 C.F.R. § 405.1875(c)(4) (emphasis added); *see also* A.R. 47 (Administrator's letter informing parties that they may submit comments).  And here the regulation tracks the Social Security procedure in *Sims*, which similarly "permit—but do not require—the filing of a brief with the Council (even when the Council grants review)."  *Sims*, 530 U.S. at 111 (plurality opinion).  But this Court did not imply—as the Providers argue—that "a party that elects not to submit optional comments to the Administrator would waive all rights to seek judicial review."  Pls.' Mot. at 5.  This case does not present a situation in which a party

submits no comments at all, and the Court need not—and does not—reach any conclusions about what would happen in that situation.

Instead, the Court held in *New LifeCare I*—and reiterates again today—that because the Providers chose to press some arguments but not the Bad Debt Moratorium issue to the Administrator, they cannot raise *that* argument here.  *See* 416 F. Supp. 3d at 19–20.  As sophisticated parties represented by counsel, the Providers were engaged in a highly adversarial process in which they raised specific issues to the Administrator.  *Compare Sims*, 530 U.S. at 112 (plurality opinion) ("The form [Social Security claimants fill out to request review] strongly suggests that the Council does not depend much, if at all, on claimants to identify issues for review.  Given that a large portion of Social Security claimants either have no representation at all or are represented by non-attorneys . . . the lack of such dependence is entirely understandable.").  Unlike a Social Security claimant, after the Providers saw how their arguments fared with the PRRB, they were in the best position to choose the issues that would gain traction with the Administrator.  *See* A.R. 51–62.

There were several ways the Providers could have preserved their Bad Debt Moratorium argument.  Their comments could have repeated or adopted their arguments to the Board.  Perhaps their comments could have even been, "we rest on our briefs to the Board," in which case they would have preserved for the Administrator's review all the arguments they made before the Board.  And, of course, they could have presented the Bad Debt Moratorium argument in their comments to the Administrator.

But the Providers selected a different route.  By choosing to make certain arguments to the Administrator at the expense of others, the Providers made strategic decisions to sway the Administrator's judgment.  That, as the Court said in *New LifeCare I*, is why "the Providers have

14

themselves to blame" for their predicament.  416 F. Supp. 3d at 20.  This is not to say that their

litigation decision was irrational.  They had received a mixed verdict from the Board, and based

on it and the Board's dense opinion, *see* A.R. 51–62, they understandably decided to re-tool their

approach for the final administrative review.  This pivot came with trade-offs, one of which is

highlighted by their current plight.

More, any similarity to the Social Security proceeding in *Sims* does not overcome the

important differences that these adversarial proceedings present.  "'It is a hard and fast rule of

administrative law, rooted in simple fairness, that *issues* not raised before an agency are waived

and will not be considered by a court on review.'"  *Wallaesa v. Fed. Aviation Admin.*, 824 F.3d

1071, 1078 (D.C. Cir. 2016) (quoting *Nuclear Energy Inst.*, 373 F.3d at 1297 (emphasis added in

*Wallaesa*)).  That principle "holds special force where, as here, an appeal follows adversarial

administrative proceedings in which parties are expected to present issues material to their case."

*Wallaesa*, 824 F.3d at 1078.  And these sophisticated Providers did exactly that, represented by

specialized counsel throughout the administrative process who filed detailed legal arguments on

their behalf before both the PRRB and the Administrator.  *See, e.g.*, A.R. 37–45, 113–14, 149,

657–58, 673–74.  These hallmarks of advocacy highlight the adversarial proceedings below.

## C.

Aside from the adversarial nature of the agency appeals, the Court must also decide

whether the Providers exhausted the Bad Debt Moratorium issue by objecting to the CMS

proceedings "while [the agency had] opportunity for correction."  *L.A. Tucker Truck Lines*, 344

U.S. at 37.  To raise an issue properly, an agency must have a chance to "address[] the issues on

the merits."  *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (citation omitted).  "A reviewing court

usurps the agency's function when it sets aside the administrative determination upon a ground

not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Unemp't Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946).

An agency need not respond on the merits for the issue to have been exhausted.  But it must have a *chance* to respond so that it has "not only has erred, but has erred against objection made at the time appropriate under its practice." *L.A. Tucker Truck Lines*, 344 U.S. at 37; *see also U.S. ex rel. Vajtauer v. Comm'r of Immig. at Port of N.Y.*, 273 U.S. 103, 113 (1927) (holding argument waived "if not in some manner fairly brought to the attention of the tribunal which must pass upon it.").

Of course, the Providers argue that they properly raised the Bad Debt Moratorium issue with the PRRB.  For instance, without citing *L.A. Tucker Truck Lines* explicitly, the Providers try to distinguish its "general rule" that courts require administrative issue exhaustion, 344 U.S. at 37, by claiming that other judges in this District "recognize that a Medicare provider preserves an argument for judicial review by raising the argument *either* during the course of the PRRB proceedings *or* in the provider's comments to the CMS Administrator," Pls.' Mot. at 2–3 (emphasis in original).  Not quite.

True, the Providers cite several cases that have found providers have waived their arguments because they failed to raise them with the PRRB or the Administrator.[6]  They simply reinforce the established rule that when a provider fails to raise an argument at *all* levels of administrative review, it has waived that argument for judicial review as well.  *See New LifeCare*

---

[6] *See Allina Health Sys. v. Sebelius*, 982 F. Supp. 2d 1, 9 (D.D.C. 2013); *Grossmont Hosp. Corp. v. Sebelius*, 903 F. Supp. 2d 39, 48 (D.D.C. 2012), *aff'd sub nom. Grossmont Hosp. Corp. v. Burwell*, 797 F.3d 1079 (D.C. Cir. 2015); *Loma Linda Univ. Med. Ctr. v. Sebelius*, 684 F. Supp. 2d 42, 56 n.13 (D.D.C. 2010), *aff'd*, 408 F. App'x 383 (D.C. Cir. 2010).

*I*, 416 F. Supp. 3d at 19 (citing *Grossmont Hosp. Corp. v. Burwell* ("*Grossmont Hosp. II*"), 797 F.3d 1079, 1083–84 (D.C. Cir. 2015); *L.A. Tucker Truck Lines*, 344 U.S. at 37.

But the Providers' characterization of these cases goes further, arguing that they prove *the only way* a provider can waive an argument is to neglect it at all stages of administrative review.[7]  As *Sims* makes clear, the correct rule is quite the opposite.  *See* 530 U.S. at 109.  And the Providers' cases follow this general rule.  In each of them, the provider had failed to raise its argument at any stage of review.  But none of the cases addressed the situation presented here, where the Providers raised their argument with the Board only to drop it before the Administrator.  *See* Pls.' Mot. at 1–2.  Since none of the cases faced this question, it is an overreach to say their holdings control here—particularly in light of *Sims*.

More, as the Secretary points out, Def.'s Opp'n at 6–7, one of the Providers' own cases directly undermines their argument, *see Grossmont Hosp. Corp. v. Sebelius* ("*Grossmont Hosp. I*"), 903 F. Supp. 2d 39, 49 n.4 (D.D.C. 2012) ("Unlike in the instant matter, those cases that have addressed the bad debt moratorium had the benefit of considering the issue with a fully-developed administrative record because that argument had been presented to the Board *and* to the CMS Administrator." (emphasis added)).  The Providers' interpretation of their cited cases is unpersuasive.

To be sure, this is a closer case than those where providers failed to raise their arguments before either the PRRB or the Administrator.  *See, e.g.*, *Grossmont Hosp. II*, 797 F.3d at 1083–

---

[7]  The Providers have committed the logical fallacy known as "denying the antecedent," concisely refuted because "'If P then Q' does not mean 'If Not P then Not Q.'"  *New England Power Generators Ass'n v. F.E.R.C.*, 707 F.3d 364, 370 (D.C. Cir. 2013).  In other words, the cases that the Providers have cited say that "If a provider fails to make its arguments at all stages of administrative review, then the argument is waived."  But the Providers rejoin, "We did not fail to make our argument at all stages of administrative review, so the argument is not waived."  This formulation reveals that the Providers have denied the antecedent.  *See also* Stephen M. Rice, Conventional Logic: Using the Logical Fallacy of Denying the Antecedent as a Litigation Tool, 79 Miss. L.J. 669, 680 (2010) (giving an example of the fallacy in common language).

84.  Indeed, the Secretary's best cases are no more instructive than those offered by the

Providers.  *See* Def.'s Opp'n at 7 (citing *Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70

(4th Cir. 1994)).  Still, "'the basic reasons which support this general principle applicable to trial

courts make it equally desirable that parties should have an opportunity to offer evidence on the

general issues involved in the less formal proceedings before administrative agencies entrusted

with the responsibility of fact finding.'"  *Sims*, 530 U.S. at 109 (quoting *Hormel v. Helvering*,

312 U.S. 552, 556 (1941)).  *See also L.A. Tucker Truck Lines*, 344 U.S. at 37 ("Simple fairness

to those who are engaged in the tasks of administration, and to litigants, requires as a general rule

that courts should not topple over administrative decisions unless the administrative body not

only has erred but has erred against objection *made at the time appropriate under its practice*."

(emphasis added)).

The Providers needed to press their claims with the Administrator even after raising them

with the PRRB.  Indeed, the D.C. Circuit addressed this question in *Environmentel*, where the

Federal Communications Commission's statute and regulation imposed an issue exhaustion

requirement.  661 F.3d at 84.  There, the Circuit considered two arguments: one that the

petitioner had failed to raise altogether before the agency, but the other—far more instructive

here—that the petitioner had raised at an intermediate level of review and then failed to raise

again before the full Commission.  *See id*.  The Circuit found issue exhaustion under that scheme

meant that "raising an issue before a designated authority is not enough to preserve it for review

before this Court; a party must raise the issue before the Commission as a whole, which

Environmentel did not do here."  *Id*.  The same principle applies here with equal force.

Returning to the adversarial litigation analogy more generally provides still other

examples of this principle.  *See Sims*, 503 U.S. at 108–09.  Arguments raised before an agency

but then dropped before a trial court are often forfeited on appeal.  *See, e.g.*, *Barnes v. Comm'r*, 712 F.3d 581, 584 (D.C. Cir. 2013) (finding argument made to IRS forfeited because petitioner "failed to make this argument before the Tax Court").  So are arguments a party raises before— but never during—an administrative hearing.  *See PruittHealth-Va. Park v. Nat'l Labor Relations Bd.*, 888 F.3d 1285, 1295–96 (D.C. Cir. 2018) ("[A]lthough PruittHealth raised its objection . . . in its initial objections to the [union representation] election, it failed to include this objection in its request for Board review.  PruittHealth therefore waived this objection[.]" (citing governing regulation)).  And in the criminal context, a defendant must renew certain pretrial objections during trial or they are waived.  *See, e.g.*, *United States v. Hicks*, 978 F.2d 722, 724 (D.C. Cir. 1992) (holding defendant forfeited pretrial suppression argument when he failed to renew the objection during trial).

The Providers also argue that the Administrator's review encompassed their arguments before the Board.  Pls.' Mot. at 5.  This argument overstates the regulations on which it lies.  Under the regulations governing the Administrator's review, the Administrator "may rely" not only on the standard fare of existing precedent and the parties' arguments, but also the entire "administrative record for the case."  42 C.F.R. § 405.1875(e)(3).  And that administrative record includes all materials submitted to the Board as well as "all documents (including written submissions) and any other tangible materials submitted to the Administrator."  *Id*. § 405.1865.  *Cf. Sims*, 530 U.S. at 111 (plurality opinion) ("The regulations further make clear that the Council will 'evaluate the entire record,' including 'new and material evidence,' in determining whether to grant review.").  And indeed, here the Administrator's decision noted that she examined "[t]he entire record, which was furnished by the Board, . . . including all

correspondence, position papers, and exhibits," plus, of course, the Board's decision.  A.R. 5; *see* Pls.' Mot. at 5.

On one hand, these portions of the regulation suggest that the Administrator has broad discretion to consider the full record before the Board, and not only those arguments raised in the parties' comments.  But on the other hand, this is no different from the Court's review of the administrative proceeding below, in which the Court serves as an appellate court "resolving legal questions."  *James Madison Ltd. by Hecht*, 82 F.3d at 1096.  Indeed, in APA review cases like this one, courts must "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706; *cf.* Fed. R. App. P. 10 (Courts of Appeals' similarly broad appellate records).  This requires courts to review "all materials compiled by the agency . . . that were before the agency at the time the decision was made."  *James Madison Ltd. by Hecht*, 82 F.3d at 1095 (citations omitted).

Yet based on these records, courts may find waiver or failure to exhaust.  *See, e.g.*, *Fritch v. U.S. Dep't of State*, 220 F. Supp. 3d 51, 61–63 (D.D.C. 2016) (finding failure to exhaust for two arguments plaintiff never raised before administrative grievance board).  Indeed, it is implicit in the waiver and exhaustion doctrines that courts will review the matters they ultimately find to be beyond the scope of review.  How else can a court determine whether the issues are indeed new?  *See Nat'l Wildlife Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) ("[T]here is a near absolute bar against raising new issues—factual or legal—on appeal in the administrative context.").

So just as the Court has sifted through the Providers' arguments to separate its waived argument from those it preserved, so too did the Administrator assess which arguments the Providers chose to press and which they dropped after the Board proceeding.  *See* Defs.' Opp'n

at 3. For all these reasons, the Court holds that the Providers failed to exhaust the Bad Debt

Moratorium issue.

## D.

Finally, the Providers argue that the Secretary waived any claim to issue exhaustion by

failing to raise the argument at summary judgment. Pls.' Mot. at 8. Indeed, the Secretary

pressed substantive arguments against the Providers' Bad Debt Moratorium claims in at least

three briefs, but never argued waiver. *Id.* (citations omitted). All of this is true, as far as it goes.

But it does not preclude application of a judicially imposed issue exhaustion requirement here.

In general, courts "rely on the parties to frame the issues for decision and assign to courts

the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S.

237, 243 (2008). Indeed, the "Supreme Court has cautioned that freely permitting departures

from this foundational norm and allowing courts to *sua sponte* raise affirmative defenses as a

matter of course would 'erod[e] the principle of party presentation so basic to our system of

adjudication.'" *Maalouf v. Islamic Rep. of Iran*, 923 F.3d 1095, 1109 (D.C. Cir. 2019) (quoting

*Arizona v. California*, 530 U.S. 392, 413 (2000)). But sua sponte action is sometimes

appropriate. *Maalouf*, 923 F.3d at 1109.

And those circumstances include questions of exhaustion. In *Dettmann v. U.S.*

*Department of Justice*, the D.C. Circuit found that exhaustion of administrative remedies "may

be raised *sua sponte* by a reviewing court, even when it has no bearing on jurisdiction." 802

F.2d 1472, 1476 n.8 (D.C. Cir. 1986). The Circuit noted that it could pass on the question even

though the parties had briefed the substantive issue at the district court, and even though "such a

course means the parties did not consider exhaustion, and we are thus without the benefit of their

briefs on this issue." *Id.*

So too in the related field of issue exhaustion.  Recall that while the Board reviewed the Providers' Bad Debt Moratorium argument, it was not a determinative issue.  *See* A.R. 54–59. The Board declined to even reach the Bad Debt Moratorium argument on several points, finding the question irrelevant to its decision.  *See* A.R. 54, 58–59.  So the record on this issue was insufficiently developed before the Board.  And because the Providers failed to raise the argument with the Administrator, she made no findings on this issue at all.  *See New LifeCare I*, 416 F. Supp. 3d at 20 ("The Court cannot determine whether the Administrator's factual finding is supported by substantial evidence because there is no factual finding.").

Had the Providers made the argument to the Administrator, she could have remanded to the PRRB for further fact finding on that issue.  42 C.F.R. § 405.1875(f)(2).  But they never did, so the record is incomplete.  And it would be inappropriate for the Court to rule against her on that basis now.  Indeed, now that the parties have fully briefed the issue for this motion, the Providers' argument is particularly unpersuasive.  *Compare Dettman*, 802 F.2d at 1476 n.8 ("we are thus without the benefit of their briefs on this issue").  But even without these, to find otherwise at this stage "would be both contrary to 'orderly procedure and good administration' and unfair 'to those who are engaged in the tasks of administration' to decide an issue which the [Secretary] never had a fair opportunity to resolve prior to being ushered into litigation."  *Id.* (quoting *L.A. Tucker Truck Lines*, 344 U.S. at 36–37); *see Comtys. for a Better Env't*, 748 F.3d at 335 (noting "deferential" arbitrary and capricious standard of review).

The Court may only review a final agency action—here, the Administrator's decision. *See* 42 U.S.C. § 1395oo(f) ("A decision of the Board shall be final unless the Secretary . . . reverses, affirms, or modifies the Board's decision.").  So acting as an appellate court reviewing that final action, the Court may not review what the Administrator did not.  *See New LifeCare I*,

416 F. Supp. 3d at 19 (citing *Nuclear Energy Inst. v. E.P.A.*, 373 F.3d 1251, 1297 (D.C. Cir.

2004) and *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996)).  As

the Secretary points out, because the Providers did not include their Bad Debt Moratorium

argument in their comments, "the Administrator did not reach any conclusions on those

matters[.]"  Defs.' Opp'n at 3.

Nor, in the end, have the Providers shown that reconsideration is appropriate because of

"(1) a clear and certain prejudice to the moving party that (2) is fundamentally unfair in light of

governing law."  *Leidos*, 881 F.3d at 217 (quotation omitted).  The Supreme Court's decisions in

*Sims*, 530 U.S. 103, *L.A. Tucker Truck Lines*, 344 U.S. 33, and *Hormel*, 312 U.S. 552, all

foreclose the Providers' claim of "fundamentally unfair" prejudice "in light of governing law."

*Leidos*, 881 F.3d at 217.[8]  For all these reasons, the Court will deny the motion.

## IV.

The question presented here is not an easy one.  The statute and the Secretary's

regulations are silent about issue exhaustion.  More, the consequences of finding a promising

argument to have been waived by the Providers are severe.  But the administrative procedures

here were adversarial, warranting application of the "general rule" that issue exhaustion is

---

[8]  Indeed, the Providers mainly rely on an unpublished district court decision addressing a non-substantive procedural issue.  *See* Pls.' Mot. at 5–6 (citing *Loma Linda*, 2011 WL 13063635).  There, the court rejected CMS's claim that the provider had waived its argument to remand the merits of its appeal from the Administrator back to the Board.  *Loma Linda*, 2011 WL 13063635, at *7–8.  But, aside from the fact that *Loma Linda* does not consider *Sims*, the court made two important findings that distinguish *Loma Linda* from this case.  *See id.*  *First*, the court found that "because the Board did not develop the merits issue in its decision, Plaintiffs could not have further developed the issue on appeal to the Administrator."  *Id.* at *8; *cf. Sims*, 530 U.S. at 105–106 (claimant's arguments to district court included challenges against the ALJ).  That is simply not the case here, where the Providers specifically raised their Bad Debt Moratorium argument before the Board, considered the way the Board addressed their argument in its decision, and could have again pressed their argument with the Administrator had they chosen to do so.  *See, e.g.*, A.R. 54 & n.11, 55, 57, 58 n.47, 59 & n.48 (references to Bad Debt Moratorium in Board's decision).  *Second*, in *Loma Linda* the Administrator herself "raised the possibility of a remand" in her letter informing the parties that she would review the Board's decision.  2011 WL 13063635, at *8 & n.16.  So unlike the substantive Bad Debt Moratorium argument that the Providers waived here, there the Administrator raised the possibility of a procedural remand in her own notice.

required.  *See L.A. Tucker Truck Lines*, 344 U.S. at 36–37.  The Providers chose not to press the Bad Debt Moratorium with the Administrator.  APA review is intended to be deferential to the Administrator, and it would hardly be deferential to reverse her on an issue the Providers did not present to her.

Plaintiffs' Motion for Reconsideration will be denied.  A separate order will issue.

Dated: May 29, 2020                                  TREVOR N. McFADDEN, U.S.D.J.